STATE *EX REL.* EDWARDS *ET AL. v.* QUERY *ET AL.*

*Messrs. Samuel Want* and *James S. Verner,* both of Dar-
lington, Counsel for Petitioners,

*Messrs. John M. Daniel,* Attorney General, *M. J. Hough, T. C. Callison* and *Claude K. Wingate,* Assistant Attorneys General, all of Columbia, Counsel for Respondent,

*Mr. S. S. Tison,* of Bennettsville, Counsel for Respondents,

February 28, 1946.

MR. ASSOCIATE JUSTICE STUKES delivered the majority Opinion of the Court.

Perhaps the best way to approach the problem presented by this case is to first examine the former so-called gasoline tax diversion suits (*State ex rel. Edwards v. Osborne,* 193 S. C., 158, 7 S. E. (2d), 526, and *idem.,* 195 S. C.,

295, 11 S. E. (2d), 260) for they involved vitally different facts and are not at all controlling of the instant issues. They were concerned with legislative attempts to divert large amounts of the proceeds of the gasoline tax to purposes foreign to its levy, in fact, to meet deficits in state appropriations for other than highway activities. But the present is not an effort to divert but to exempt a single class of users from payment of the tax except to the extent of one cent per gallon. It should be here explained parenthetically that the mechanics of the law, which require payment in full of the existing gasoline levy and formal application for refund of all save one cent per gallon on that used in tractors and other farm machinery, are for the purpose of preventing frauds in the refunds. The plan is, in effect, an exemption from the tax (except one cent per gallon) on gasoline used in the specified farm machinery, on farms and for farm purposes.

The former *Edwards cases, supra,* applied sections 2 and 3 of Article X of the state constitution of 1895, and the attempted legislative acts there under review were found to be in violation of them. Other constitutional questions were expressly avoided. A mere reading of the decisions is sufficient to show their present inapplicability so they need not be further discussed in order to distinguish them. This disposes adversely to petitioners of their question II which imputes unconstitutionality of the act for diversion of tax revenues in violation of Art. X, sec. 3.

However, light upon the issues now before us is provided by these former *Edwards cases.* That reported in 195 S. C., 295, 11 S. E. (2d), 260, contains an analysis of sec. 5969 of the Code of 1942 which was sec. 8 of the Act of 1929 (36 Stat. at p. 682) and an adjudication of the order of priority of the purposes to which the gasoline taxes (and motor vehicle license fees) are devoted by law. We quote from the opinion as follows:

"The section then provides for the disbursement of the funds in the order stated, for (1) costs of administration, etc., not exceeding $450,000.00 annually (2) maintenance of debt service on (a) State Highway Certificates of Indebtedness, and (b) reimbursement agreements (3) sinking fund payments; (4) road maintenance; (5) road construction and other purposes."

It is seen at a glance that the petitioners who are bondholders, owners of "State Highway Certificates of Indebtedness", are in a very preferred position with respect to their right to payment from the revenues. If there is any net loss of taxes from the operation of the act, which the legislature has found not only will not occur but an increase will result, before these creditors suffer there would have to be such loss as to more than exhaust all of the otherwise available funds for (1) road construction and "other purposes", (2) road maintenance, (3) sinking fund payments, and (4) reimbursement agreements. Thus the fear which they assert is plainly imaginary (in view of the official figures hereinafter) rather than real and their position cannot possibly be a practical one.

The latter is demonstrated by the published report of the meeting of the State Highway Commission in December 1945, when they proceeded pursuant to the following ing provision of Code sec. 5969: "Not more than thirty days prior to the beginning of each calendar year the state highway commission shall make an estimate of the revenues to be received by the * * * department during said calendar year from said gasoline tax and motor vehicle license tax and shall also estimate the amounts required", etc. The stated report of Dec. 20, 1945, reveals an estimated cash balance of $11,500,000.00 as of Jan. 1, 1946, less commitments of $2,550,000.00 leaving a balance of $8,950,000.00. Revenues for the 1946 calendar year were estimated at $12,725,-000.00, making a total of cash and anticipated revenues of

$21,675,000.00; and 1946 expenses were estimated at $7,-956,751.39, leaving a balance for road maintenance and construction of $13,718,248.61.

The commission's estimate of 1946 "expenses" is comprised of the following items and amounts (No future fiscal or calendar year now contains heavier debt maturities):

| | | |
|---|---:|---:|
| Administration and Collection of Revenue | | $ 400,000.00 |
| Accident Claims | | 25,000.00 |
| Reimbursement to Counties and Road and Bridge Districts: | | |
| Principal | $ 1,125,475.36 | |
| Interest | 190,326.03 | |
| | $ 1,315,801.39 | |
| Less: Earmarked Funds Held for Retirement of Principal | $ 11,500.00 | 1,304,301.39 |
| Certificates of Indebtedness: | | |
| Principal | $ 4,845,000.00 | |
| Interest | 1,382,450.00 | 6,227,450.00 |
| Sinking Fund Deposit | | .00 |
| Total | | $ 7,956,751.39 |

(An apparent discrepancy is noted between sec. 5969 of the Code and the above-quoted summary of it in the opinion in the second *Edwards case*, 195 S. C., 295, 11 S. E. (2d), 260, in the detail of the order of priority of the application of the highway department revenues. The statute (36 Stat., at p. 682) ranks reimbursement obligations (payments to or for counties, highway and bridge districts)· ahead of principal and interest on state certificates of indebtedness. But this is now unimportant, in any event, because the re-

imbursement program is nearing its end of payments thereunder and borrowing is and will be done by the sale of state certificates of indebtedness.)

(It appears from the above tabulation that the department contemplates no contribution from 1946 receipts to the "sinking fund". But almost certainly there will be. It is required by sec. 5972 of the 1942 code (sec. 11 of the Bond Act of 1929, 36 Stat., at p. 684) that whenever the departmental revenues exceed those of the next preceding year by more than five per cent., one-half of the excess shall go into this fund. It is a sort of safety valve and not a true sinking fund as that term is ordinarily used, for the highway obligations are issued to mature serially and the maturities, principal and interest, are met from current revenues or the proceeds of the sale of new obligations, and are not paid from the so-called sinking fund. It has thereby grown to over a million and a half dollars and constitutes a back-log of safety to the department and the holders of its obligations, including petitioners.)

From the foregoing figures it is seen that after payment of the operating expenses of the department and its 1946 financial obligations from its cash balance and estimated receipts there will remain an estimated $13,718,248.61 for maintenance and construction of state highways, which only will be reduced, if indeed there is any reduction of revenue (which the legislature says not) resulting from the law now opposed.

Furthermore, it is within common knowledge that there has been a great increase in the consumption of gasoline, and therefore in the receipt of gasoline taxes, since the recent removal of the war-necessitated rationing, and it is generally anticipated that there will be a further marked increase in consumption when more automobiles are available for use for pleasure and in business. The Commission has not given full weight to these factors; its estimate of

1946 revenue is patently too low. As stated above, it has estimated total revenue at $12,750,000, which includes only $10,000,000 from the five-cent gasoline tax. This is only a little more than the lean war years. The actual receipts from such tax during the last five fiscal years were as follows, in nearest thousands:

| | |
|---|---|
| 1940-41 | $ 12,147,000.00 |
| 1941-42 | 12,766,000.00 |
| 1942-43 | 8,935,000.00 |
| 1943-44 | 9,207,000.00 |
| 1944-45 | 9,639,000.00 |

In the month of November, 1944, the receipts were $810,-244.38; in November 1945 (the last month for which official figures are available), with rationing ended, $1,064,168.85. In view of this increase of over thirty per cent. it appears that a conservative 1946 estimate would at least equal the last pre-war year and substantially top twelve million dollars instead of the ultra-conservative figure of $10,000,000-.00, adopted by the commission in its December estimates. The same story of increase occurs in the receipts of motor vehicle license taxes. In November 1943, they were $618,-647.75; November 1944, $648,495.75; and November 1945, $798,886.05. But all of this is "carrying coals to Newcastle" for the facts and figures of the commission already make impossible any lack of means to meet the debt obligations of the department. This is recognized, and practically admitted, in the petition before us, where it is said in paragraph VI as follows:

"The said statute constitutes a step in the process of occasional or systematic attrition of the revenues of the South Carolina Highway Department which were levied for a special purpose and appropriated to the accomplishment of such purpose, creating a precedent under which many other special classes of users of gasoline are in effect invited to peti-

tion the General Assembly for similar relief from the five cents (5¢) gasoline tax."

But the validity of the present statute does not depend upon what legislation may come hereafter, and whether it is a bad example in policy or expediency is not for the court to determine and should not influence our decision of this case. Moreover, the theory of the law is that its working will not cause a depreciation in the revenue, but actually an appreciation. (The argument that it might as reasonably be anticipated that a reduction of the gasoline tax on all users would increase consumption is unsound for here it has been found that present users of the inferior, untaxed fuels will convert their machines to the use of gasoline which will be taxed at one cent per gallon, and more farmers will adopt machines in place of work animals, thereby creating two new classes of consumers of gasoline. All of which appears quite reasonable.)

Nevertheless, petitioners finally say in argument (for their question IV) that the act violates the state and federal constitutions for it impairs the obligations of their contracts —their certificates of indebtedness.

Intertwined with this question is that of petitioners numbered I, which will be first discussed, that consideration of the constitutionality of the act should not be affected by its preamble because (a) the conclusions of it are contrary to facts of which the court will take judicial notice; (b) it is a prognostication instead of findings of actual fact; and (c) it is not within the legislative power to adjudicate such a fact as this to the exclusion of inquiry by the court.

The effect of a legislative finding of fact by way of express preamble or by implication from the passage of the law is an interesting and important question which has not heretofore received much consideration by this court, but see reference thereto in the discussion of the Bond Act of 1929 in *State ex rel. Richards v. Moorer, infra.* (See also,

*Woodworth v., Gallman,* 195 S. C., 157, 10 S. E. (2d) 316). Counsel for petitioners and respondents take extremely opposite views, neither of which is sustained by what appear to be the better considered authorities. The petitioners say that in a case of the present character, where the legislation does not deal with the public health, public safety, public convenience, or other matters affecting the *general welfare of all the people,* it is not within the power of the General Assembly to adjudicate factual issues to the exclusion of inquiry by the courts. But the distinction of the necessity for effect upon the *general welfare of all the people* is not clear and is asserted without citation of authority. On the other hand, respondents contend that the legislative finding is conclusive upon the courts. However, it is easily seen upon even slight consideration that such a rule as the latter would upset the balance of powers between the legislative and judicial departments, and the latter would be rendered powerless in many cases to relieve the people from unconstitutional legislation. And the legislature and the courts are but servants of the people, each independent of the other in their respective spheres but always subject to constitutional limitations.

There is a valuable, exhaustive annotation upon the subject of legislative findings in 82 Law. Ed., 1244, following report of the case of *United States v. Carolene Products Company,* 304 U. S., 144, 58 S. Ct., 778, 82 Law. Ed., 1234. It is there pointed out that there are many instances where the constitutionality of an act depends upon pertinent facts and in such a case it is presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment. However, by the better rule, such implied or express finding is subject to judicial review, and the court may consider extrinsic evidence for this purpose, although the statute will not be held unconstitutional unless such (legislative) finding is clearly

erroneous. 11 Am. Jur., 820, 822; *Weaver v. Palmer Bros. Co.* (1926), 270, U. S., 402, 70 L. Ed., 654, 46 S. Ct., 320; *Borden's Farm Products Co. v. Baldwin* (1934), 293 U. S., 194, 79 L. Ed., 281, 55 S. Ct., 187; see also Cooley's Constitutional Limitations, 8th Ed., Vol. 1, p. 379, 380.

The respondents were not called upon in this case to present evidence of presumed facts and the unquestioned rule is that there is a presumption in favor of the existence of the facts necessary to justify the constitutional passage of the act. And here there are expressly stated conclusions of fact which the Court cannot brush aside as irrational. Aside from the demands of justice, a proper respect for the General Assembly, a coordinate branch of the government, requires otherwise. Before us is a brief, *amicus curiae,* filed with our premission by the South Carolina Farm Bureau. In it appears the following:

"At the hearing before the Ways and Means Committee in the Hall of the House of Representatives the following facts were presented:

"That there were, according to the U. S. Census, 8,400 farm tractors in South Carolina in 1939; that this number now probably has reached 10,000 tractors; that of this 10,000 tractors by far the greater part operate on kerosene and other fuel oils, using gasoline (about one gallon per day) for starting and warming only; that the highest estimate of gasoline burning tractors was 1,500 tractors, the lowest 650 tractors, and the tractors using gasoline exclusively were small tractors, used for light work and consuming on the average about 10 gallons of gasoline per day; that the average fuel consumption of the non-gasoline-using tractors (which are the general purpose tractors most commonly used), is from 20 to 30 gallons of fuel per day and that such tractors use about one gallon of gasoline per day for starting and warming only; that based on the above figures, and using the maximum estimate of gasoline-using

512

tractors, present gasoline tax revenue per day of operation is as follows:

1,500 light tractors at 10 gallons per day at 6¢
   tax ....................................$   900.00
8,500 gen. purpose tractors at 1 gallon per day
   6¢ tax ...........................   510.00

   Total Revenue per working day .........$  1,410.00

"Applying to the same figures the one (1¢) per gallon tax provided in the Act in question, we find:

1,500 light tractors at 10 gallons at 1¢ per gal-
   lon tax ...........................$   150.00
8,500 gen. purpose tractors at 18 gallons at 1¢
   per gal. tax ........................  1,530.00

   Total Revenue per working day under Act of
   1945 ...........................$  1,680.00
   Total Revenue per working day under 6¢ tax  1,410.00

   Increased Revenue per working day under
   Act of 1945 .......................$   270.00

"On the basis of 200 working days this means an increase of $54,000.00 in revenue per year, using the figures most favorable to petitioners' contention. Using the figure of 650 gasoline burning tractors, however, and calculating as above we find that revenue will be increased $159,-400.00."

The experience of the State of Mississippi is referred to in argument, where it is said that 1.45% of the total gasoline revenue has been refunded during the last four years, but there is no way of determining how much more gasoline was consumed in the farm machinery of that State because of the five-sixths agricultural refund, so there may well have been a real increase in the net taxes collected. The latter is what the legislature has found will happen here,

as is indicated by the evidence before them, some of it quoted above.

On the other hand, petitioners' counsel submit information upon the experience of the State of North Dakota, which, however, is said to be as unlike South Carolina as Mississippi is alike, and there over seventy per cent. of the whole collections of gasoline tax has been refunded under the terms of a similar law. That State is a sparsely settled one, more dominantly agricultural than ours, with highly mechanized farms, and their law is not before us. It may contain less safeguards against fraud than ours or that of Mississippi. Possible fraud has been introduced into the argument as reason against the validity of the Act, but improperly so for it relates only to the wisdom and expediency of the law, with which the court is not concerned.

There has been an erroneous approach to the whole problem of considering a legislative finding which has been reached after evidence in the form of legislative hearings. The burden of the attack is upon petitioners, which they have not met at all. Their argument seems to ignore the presumption of accuracy of the legislative findings and attacks them with repeated and vehement denials, but no proof. The burden does not rest upon respondents to prove the presumed, in the absence of a factual showing to the contrary.

There is much interesting argument in petitioners' briefs to show that it is economically profitable for South Carolina machine-farmers to pay the full six cents tax and use gasoline rather than the untaxed, cheaper crude oil or kerosene. But that is not the point of the legislation. The use of the taxed or the untaxed, less efficient fuel occasions a financial handicap to South Carolina farmers, in competition with those of other states, which the law is intended to remove. But that, too, is beside the point. However, it is worth citing from the arguments, which appear to be undisputed, that three-fourths of the states of the Union pro-

vide tax exemption or concession in this respect to farm-used machinery, and no condemnatory court decisions there-about have been cited.

The foregoing answers points (a) and (c) of petitioners' question I; and reverting to their objection (b) to the finding of the legislature of no loss of revenue, that it is rather a prognostication, that also is untenable. Practically all tax laws look to the future and their results are not predictable with mathematical accuracy. Upon the cited evidence, and possibly other and additional which is not before us, the General Assembly has decided that the gasoline tax revenue will not decline but increase. How could it otherwise make such determination, except from observation of the operation of the law? There comes to mind the old story in rhyme of the fearful mother who instructed her darling daughter to learn to swim by hanging her clothes on a hickory limb but admonished her not to go near the water.

Our leading case upon state highway financing is *State et rel. Richards v. Moorer,* 152 S. C., 455, 150 S. E., 269. It appears also to be a prime authority upon the value and importance of a legislative finding in the form of a preamble to an act. It was said in the opinion concerning the Bond Act of 1929, which recited prognostic findings in its preamble, as follows:

"It (the General Assembly) first satisfied itself of the sufficiency for this purpose of the gasoline tax and the license fees to be collected during a period of years. In the preamble it is declared: 'The State Highway Commission has made a conservative estimate of revenues and liberal estimate of expenses, from which it appears that the revenues to be derived annually during the next twenty-four years from the gasoline tax and the motor vehicle fees will be sufficient, without resorting to a property tax, to pay the sums required',", etc.

It cannot be less accurately said now that the legislature has satisfied itself that enabling farmers to operate their machinery with gasoline instead of less efficient but tax-free kerosene or crude oil will not adversely affect the revenues from the gasoline tax. In fact, they have found (and the court has not found, and has no evidence before it to find, differently) that one cent tax (imposed by the act) upon the farm-used gasoline will increase the revenues.

The opinion in *Richards v. Moorer* contains the further significant language, apropos here: "So, in order to meet the contingency * * * the legislators, as good business men, having at heart the best interest of the state in the accomplishment of the thing sought to be done, provided * * *" etc.

Is there anything before us in this contest to indicate that the legislature is not still composed of "good business men, having at heart the best interest of the state", or that they are less reliable fact-finders than they were in 1929? We do not think so.

It seems to us that the factual situation so forcibly shown by the figures which have been cited leaves nothing in the contention that the act impairs the contracts of the petitioners who are certificate holders. The funds which petitioners say will be curtailed by the operation of the act are not pledged in their entirety, by any means, to the payment of the financial obligations of the highway department; and it is not even so alleged by the petitioners. Payment of the certificates and interest thereon is only one of the purposes, second, in order of priority only to the cost of operation of the department, which latter is limited to $450,000.00 per year, now estimated at the lesser figure of $400,000.00. Reference to the official figures given in some detail above shows the impregnably secure position of the petitioners who hold certificates of indebtedness.

The Legislature has found, and not unreasonably as we have seen, that there will be no loss of revenue, but let us take petitioners' position at its best and by their own contention, for which we copy from their brief, as follows:

"Taking figures comparable with those in other states which have a similar exemption, it may be estimated that something like five million gallons per year would be involved in the refunds under the Act, after the same becomes more widely known and understood by farmers. Five million gallons with the five (5¢) cents tax imposed would yield the State Two Hundred and Fifty Thousand ($250,000.00) Dollars in revenue. It therefore would take thirty-million gallons of gasoline to produce at five-sixths of a cent per gallon the revenues that would be lost through the elimination of the five (5¢) cents gasoline tax."

It may fairly be assumed that this is an extreme view of the possibility of reduction in revenue by application of the law for it is the extent of petitioners' argument upon the point and is, of course, widely divergent from the legislature's finding that there will be no loss, but increase, of revenue under the law. Application of petitioners' contended annual loss of $250,000.00 to the aggregate of the revenues of the department shows at a glance its comparative insignificance. Such loss would only serve to curtail construction and would not touch the ability of the department to meet its obligations to petitioners and other certificate holders. It would at worst reduce the annual construction of new highways by about twenty-five miles or less, under the current, published cost of bituminous surfacing. There is no allegation of the petition which is in contradiction of this plain fact, no claim that the working of the law, in the most pessimistic view of it, will affect the payment of the principal and interest of the obligations held by petitioners and other like certificate holders. That is the inconsistency of petitioners' position upon this point. Their contracts from

the state will not be, in fact, impaired, in the worst view of the law but there will only be decreased the maintenance and construction funds of the department. This the legislature is not prohibited by the constitution from doing.

In this connection there has been published in the press, and the fact is contained in the record, that the department is planning a construction program for the next three years which will entail the expenditure of $42,000,000.00 by its own large means and prospects and such federal aid as will be obtainable during that period. Under petitioners' estimate in argument of an annual loss of $250,000.00 on account of the law now assailed, the forty-two million dollar three-year construction program would be reduced to $41,-250,000.00 ($42,000.00—3 yrs. x $250,000.00 Annual loss). The contest is thus seen to be of not near the consequence that the pleadings promised.

Petitioners' main reliance for their argument that the law violates the contract clauses of the state and federal constitutions in the case of *Martin v. Saye,* 147 S. C., 433, 145 S. E., 186, which, upon examination, does not sustain the contention. There the applicable section (No. 4) of the 1927 act which was under review (35 Stat. 1081) provided that the premium and accrued interest received from the purchaser of the bonds, after payment therefrom of certain expenses, "shall be applied to the payment of interest on the bonds." Thus the dedication was exclusive of all other purposes and objects. The court concluded that the moneys could not be diverted by subsequent legislation to the improvement of other roads than those for the construction of which the bonds were issued. This digest of the decision differentiates it from the present problem. Here the gasoline tax revenues are devoted to several purposes, not only to the payment of the obligations in question, but to administration, maintenance, construction of new roads, etc., as we have seen. And this is a fatal fallacy of petition-

ers' argument. They treat the highway revenues as having been devoted by law to the single object of the payment of debt obligations, which is not true, and there are abundant revenues in sight for all designated purposes except that the completion of the construction of the state highway system will be somewhat deferred, if loss of revenue results from the law, and that is for the decision of the legislature. The gasoline tax is not inviolable for the purpose of paying highway indebtedness; and the contrary is the mistaken premise of petitioners' position.

It is like the case of one who registers in a hotel and is given a room or suite there. It is his exclusive domain but he has no control over other rooms and suites which are let to others. The petitioners who are bond or certificate holders are comfortably and safely quartered in the structure of the highway revenues but their security, and therefore their right, does not extend to the whole building. It is as if the hotel proprietor should close to occupancy another room or suite, or even a floor of such, not taken by this supposed guest. He could not complain for his accomodation would not be disturbed. Nor can petitioners complain.

Until comparatively recent years bonds issued by the state and its subdivisions were almost invariably paid by property taxes. It was (and is, in such cases) usual for the enabling act to provide for the levy of *sufficient millage* by the administrative officers to meet the principal and interest maturities. The statute books are full of such enactments and sections 5336, 5414, 7321 and 7329 of the Code afford examples of general laws so providing.

The levy is flexible to meet the exigencies of the circumstances; and one never heard of question being raised as to the authority and power of such administrative officers to reduce the levy when it becomes larger than necessary to meet the obligations. Yet petitioners apparently contend that no reduction of, or exemption from, the gasoline tax

is legally possible by the legislature so long as there is outstanding a solitary certificate of indebtedness or there remains a mile of state road unpaved. We do not think this position is supported by reason or authority.

Logical extension and application of the petitioners' argument would prevent the use of any of the highway revenues for any purpose other than the payment of principal and interest of petitioners' and others' certificates of indebtedness and reimbursement obligations. They are the only contracts involved. Are they impaired any more by refunding five cents of the tax on farm machinery-used gasoline, even should such course cost $250,000.00 per year, than by spending $250,000.00 on new highway construction? We do not think so. Certainly each leaves the department equally poorer in funds. But its obligations have not been impaired in a constitutional sense, and fortunately they should not be worth one whit less in the financial markets.

It is said in one of the briefs that many of the highway bonds or certificates of indebtedness sell on today's markets at a price which yields about half the interest rate upon which they were originally sold by the state, and their high investment value and desirability is well known. No sound reason has been suggested in this litigation why this record will not be maintained. It is an irrefutable testimonial to the fine judgment and administration of the department and commission. If and when experience is had in the working and effect of the present law we are confident that whatever changes may be necessary or desirable in the financing of the department will be accurately ascertained and faithfully followed to the end that the splendid record will be preserved.

It is just impossible to see any impairment of petitioners' contracts by the act under attack, even disregarding the findings of the legislature (which have not been overcome) and granting the accuracy of petitioners' prediction of an an-

nual loss in revenue of $250,000.00. The act works no deviation in the terms of the contracts and does not affect their enforceability or the means of collection. The holders have no right to the preservation of all of the highway revenues intact. The "pledge" to them is only of sufficient of the funds to pay the principal and interest of the certificates of indebtedness as they mature. And there is not the slightest danger of default in prospect, even in the view which petitioners present in argument.

The decisions of the United States Supreme Court (which of course, are controlling of the construction of the contract clause of the federal constitution) which are cited in the opinion of Mr. Justice Lide are, in our view, of no help here. Reference to them shows that they were concerned with other problems than that now presented and, on that account, they need not be reviewed. Their facts differentiate them.

The nearest approach to the facts of this case that we have been able to find in the decisions of the Supreme Court is *Gilman v. Shebygan,* 67 U. S., 510, 17 L. Ed., 305. There a city issued bonds under an act which required the levy of taxes upon *all of the taxable property* of the city for the payment of the bonds. Some years later, with the bonds outstanding, the state legislature passed an act whereby it was required that the levy should thereafter be on *real estate exclusively, exempting personalty.* A defaulting real estate taxpayer attacked the subsequent act upon the ground that the bond issue was authorized upon a tax on all the taxable property and the bonds were issued and taken upon the faith of that act, the provisions of which constituted a contract with the bondholders which the subsequent act sought to violate. On this contention the Supreme Court said: "The imposition, modification, and removal of taxes, and the exemption of property from such burdens, is an ordinary exercise of the power of state sovereignty. There

is no pledge, express or implied, that this power should not thereafter be exercised." The Court further commented that there was no allegation that the remaining tax levied, on real estate alone, was insufficient, and remarked that the bond-holders were not complaining. The latter at first blush seems rather to weaken the decision as an authority here, but upon reflection we think it loses none of its weight on that account. In this case bondholders (certificate holders) are be-fore us, but they have no grounds of complaint. They are shadowboxing. Their rights are uninjured and there is no prospect of injury to them or impairment of the obligations of their contracts. The conclusion of the court in *Gilman v. Sheboygan* is consonant with the expression which is found in the rather recent case of *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U. S., 502, 86 L. Ed., 1629, 62 S. Ct., 1129, as follows: "The Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' *Davis v. Mills*, 194 U. S., 451, 457, 24 S. Ct., 692, 695, 48 L. Ed., 1067."

Suppose gasoline should soon become obsolete as a motor fuel and fall into disuse, which is not a fantastic thought in this "atomic" age of rapid scientific development, would pe-titioners resist repeal of the gasoline tax (then worthless) and the levy of another tax, with the proceeds of which the obligations held by them might be paid? Hardly, and yet their present "theory" would still stand. The one position is scarcely less practical than the other.

While possibly not directly in point, the case of *Michaels v. Barrett*, 355 Ill., 175, 188 N. E., 921, is interesting for it involved attack upon the statutory diversion of a portion of the gasoline tax revenues of that state from formerly desig-nated purposes to pay interest and principal maturities of bonds issued to obtain relief funds for aid of the destitute in the recent depression. The point was urged in that liti-gation, as here, that contracts for the payment of highway

bonds were impaired by the diversion. The statute there under attack provided that one-third of the proceeds of the state gasoline tax should be apportioned to the counties and disbursed, first, to pay the interest on, and the maturing principal of, the emergency relief bonds, and thereafter for any one or more of seven purposes, one of which was the payment of highway bonds. The court held that under these circumstances the contractual relationship asserted by the plaintiff taxpayer did not arise and pithily said that a nonexistent obligation cannot be impaired. The problem was at least similar to ours now and the Illinois court's solution is helpful, for the certificate-holding petitioners before us have no contract right to all of our state gasoline tax revenues and, being unable to rightfully assert such, cannot successfully claim the constitutional impairment of a contract which does not exist.

Just as there is no *contract* impairment of petitioners' certificates because there was and is no contract to hold subject to them all of the proceeds of the five cents gasoline levy, there is no *impairment* in the constitutional sense because the ability of the state to meet the obligations is not jeopardized. This is the simple but satisfactory answer to the controversy and is illustrated by many of the state and federal decisions collected in the annotation in 156 A. L. R., 1264. It is there said by the editor, with supporting cases in the footnotes:

"The constitutional objections to legislation reducing the taxing power of a municipality would not seem to be applicable where the municipality still has adequate revenues or resources with which to pay its obligations according to their terms. A constitutional limitation upon the rate of taxation by municipalities may be applied even to levies for the purpose of paying pre-existing debts of the municipality, unless there is an actual impairment of such obligations. * * * And a statute changing the basis or method of

assessing property for taxation does not unconstitutionally impair the obligation of pre-existing bonds, although resulting in a reduction of taxes, if sufficient revenues will remain available under the new mode of assessment to pay the principal and interest of the obligations as they become due."

There is an earlier annotation, 109 A. L. R., 817, in which practically the precise question before us is treated. The discussion refers to the power of a taxing authority to exempt property which was subject to a tax levied for pre-existing indebtedness, and whether such subsequent exemption is contrary to the constitutional guaranties against impairment of obligations. The cases reviewed, including *Gilman v. Sheboygan, supra,* principally involved property taxes and not the more modern license or sales taxes, such as our gallonage tax upon gasoline, but the principle is the same, and appears to be well-settled. The following is quoted from the annotation (109 A. L. R., at p. 818, 819) :

"According to the weight of authority, supported by decisions of the United States Supreme Court, the issuance of bonds or the incurring of other obligations by a municipality under the authority of a statute providing for an annual tax on the 'taxable property' in the municipality for the payment thereof, does not give rise to a contractual obligation not to exempt thereafter any property from the class of taxable property existing at the time of incurring the obligations; and hence, such an exemption, which would otherwise be within the power of the legislature and which does not unreasonably deplete the security of pre-existing obligations, does not impair the obligation thereof, within the prohibition of the contract clause of the Federal Constitution. *Gilman v. Sheboygan* (1863) 2 Black. (U. S.), 510, 17 L. Ed., 305; *Arkansas S. R. Co. v. Louisiana & A. R. Co* (1910), 218 U. S., 431, 54 L. Ed., 1097, 31 S. Ct., 56; *State, Hall, Prosecutor v. Parker* (1869), 33 N. J. L., 312;

*Bailey v. Sutch* (1867), 6 Phila. (Pa.), 408. And see *Palo Verde Irrig. Dist. v. Seeley* (1926), 198 Cal., 477, 245 P., 1092."

If petitioners' position were granted, that the law in operation will cause the gasoline tax receipts to fall off, despite the factual finding of the General Assembly to the contrary, it should be observed that there is no practical difference between decreasing the revenue for highway purposes and increasing the obligations upon it, certainly so far as bondholders' interests are concerned. We have in mind the repeated legislative additions to the system of state highways. Statistics before us show that the mileage has grown from about 6,000 in 1929 to approximately 17,000 when the commitments of existing legislation are fulfilled. Petitioners urge this growth of the system against the validity of the present law, but they do not contend, as consistency requires of them, that the various legislative acts adding mileage are unconstitutional diversions of highway revenues in the respective amounts required for the additional expenditures for maintenance and construction. They are expenditures which were not encompassed within the stated purposes of the Bond Act of 1929 and surely lessen the overall ability of the highway department to meet its obligations.

The act of 1936, No. 831, 39 Stat., 1557 (which was passed over executive veto as was that before us) contained provisions for reductions in the annual license tax fees theretofore imposed upon motor vehicles (compare the rates provided by sec. 5894 of the 1932 Code), which were pledged for highway purposes and the payment of road and bridge obligations by the Act of 1929, 36 Stat. 670 (Code of 1942, sec. 5947 *et seq.*), just as plainly and effectively as were the proceeds of the five cents per gallon gasoline tax. The 1936 act was under constitutional and other attack in the action reported as *State ex rel. Coleman v. Lewis et al.*, 181 S. C., 10, 186 S. E., 625. A multitude of points

of alleged vulnerability was made and disposed of by the court, but that now pressed was apparently not even raised. Similarly, act No. 770 of 1934 provided a reduction of 50% in the annual license fees of most vehicles; and No. 1196 of the same year even provided a refund of 50% of certain motor vehicle fees already legally collected (38 Stat., pp. 1348 and 2257), all without court contest. Moreover, the tax upon gasoline consumed in aircraft was lifted from the purpose to which it was formerly dedicated by the Act of 1929 and devoted to the support of the State Aeronautics Commission and its activities by Act No. 317 of 1935, 39 Stat. 447 (Code of 1942, sec. 7112-20), the propriety of which seems never to have been challenged in the courts. Upon these occasions holders of state highway obligations were evidently undisturbed and we think the present petitioners who complain see only a bogeyman.

From the foregoing it appears that the legislature has not diverted any gasoline tax revenues or endangered the payment of the obligations for which they are pledged, so the contract clauses of the federal and state constitutions have not been violated by the challenged enactment. The latter is inescapably true for there is no impairment or possibility of such. Petitioners' argument that funds for the completion of the State Highway System will be depleted, if true in its factual phase (which has not been shown), is beside the point of this litigation. It goes only to legislative policy with which the court has nothing to do. The recent course of legislation indicates that the system will grow in mileage like the proverbial snowball does in circumference, and the means to complete it will never quite catch up. (The last example is Act No. 167 of 1945, 44 Stat. 261, adding five thousand more miles.) But that, again, is a matter for the General Assembly, not the court.

The only remaining charge of unconstitutionality (petitioners' No. III) is as follows: "The said Act violates the

provisions of the United States and South Carolina Constitutions which prohibit the denial of the equal protection of the laws to all citizens of the State and which prohibit the granting of an exemption from taxation to the arbitrarily defined class specified in the Act."

Petitioners' discussion of this ground is brief and cites only the cases of *Gregg Dyeing Co. v. Query* (166 S. C., 117, 164 S. E., 588) and *Eastern Air Transport, Inc., v. Tax Commission* (52 Fed. (2d), 456, affirmed in 285 U. S., 147, 52 S. Ct., 340, 76 L. Ed., 673).

The petition, par. VI (b), is as follows upon the alleged point:

"The said Act discriminates against taxpayers of the class in which the petitioners belong, and in favor of farmers, by giving the latter an arbitrary exemption from the tax liability in question, and by discriminating against other special classes of users of gasoline such as the owners of stationary engines, sawmills, and boats, all to the prejudice and loss of the petitioners and other taxpayers to the extent of the depletion of the funds available for the payment of the obligations of the South Carolina Highway Department, and subjecting the petitioners and other taxpayers of the State to the risk of property and other taxation to make up the loss of revenues sustained as the result of the statute in question."

It is seen that this reaches back into the "diversion" contention which has been found untenable. However, petitioners say in their brief:

"Although this Court recognizes the elementary principle that the constitutional requirements as to equality and uniformity of taxation are in strictness applicable only to *ad valorem* taxes and not to excise taxes, and that excise taxes may be imposed in a varying scale, so long as all persons in the same class are treated alike, it was held in the

*Gregg Dyeing Company case, supra,* and in the *Eastern Air Transport case, supra,* that the public·policy in this State 'is that all consumers shall pay the gallonage tax of six (6¢) cents'. As these cases hold, the burden of the tax is imposed upon the consumer of gasoline and the purpose and effect of the South Carolina legislation is to tax all *users* alike."

The argument overlooks that public policy is as declared by the makers of the laws. *Weeks v. New York L. Ins. Co.,* 128 S. C., 223, 122 S. E., 586, 35 A. L. R., 1482; *Alderman v. Alderman,* 178 S. C., 9, 181 S. E., 897, 105 A. L. R., 102. Surely it follows that a formerly existing principle of public policy cannot be invoked to extend the life of a tax which has been repealed or provision made for its refund by legislative enactment. "Rules of * * * policy, therefore, disappear in the light of expressed legislative declaration." *City of Greenville v. Query,* 166 S. C., 281, 164 S. E., 844.

This portion of petitioners' brief is quoted from again, as follows:

"It is to be borne in mind that we are not dealing with the question whether an exemption of the present character, if contained in the original 1929 Act imposing the tax, would have been constitutionally supportable. If the General Assembly had concluded then to make the exemption, it would have established a policy contrary to that arising out of the 1929 legislation and described in the *Gregg Dyeing Company case,* and thus would have eliminated from consideration the interlocking factors arising out of the issuance of immense amounts of funded obligations on the faith of the policy originally announced. The discriminatory characteristics of the Act would not, under such circumstances, have so deeply affected the application of constitutional provisions to the 1945 Act."

Petitioners' concession that exemption of farm-used gasoline in the earlier law would not have violated the equal

protection provisions of the federal and state constitutions sufficiently answers any contention that such subsequent change or amendment of the law is invalid on that account, and discussion of the point need not be extended. But there is a wealth of authority for the proposition that agriculture constitutes a class which may be favored in, or exempted from, certain forms of taxation and regulation without running afoul of the equal protection provisions of the constitutions. 2 Am. Jur., 399; 12 *idem,* 194; 89 A. L. R., 1436, 109 *idem,* 570; 130 *idem,* 1329; *State ex rel. Coney v. Hicklin,* 168 S. C., 440, 167 S. E., 674 (affirmed, *Hicklin v. Coney,* 290 U. S., 169, 78 L. Ed., 247, 54 S. Ct., 142). It is interesting to note that the latter case related to the use of the highways of this state.

An adjudication that an act of the legislature is violative of the constitution, state or federal, and, therefore, invalid calls into play a delicate power of the courts and should be exercised with utmost caution and only in clear cases. It is a "balance" of the government of checks and balances and constitutes a restraint upon the representatives of the people, whose the government is; and those representatives, constituting the legislature, are vested with plenary powers of government, limited only by the constitution, with which, it must be assumed, they conscientiously try to comply. In the interpretation and application of it, courts are and should be cognizant of a strong presumption in favor of the validity of legislation. It has been often said by this and other courts that unconstitutionality is found only when it is seen beyond a reasonable doubt. 16 C. J. S., 265; 11 Am. Jur., 719; 1 Cooley's Constitutional Limitations, 371 *et seq.,* and the myriad cases cited in the footnotes to these texts; South Carolina decisions in 7 S. E. D., 465 *et seq.,* Constitutional Law, key number 48. We think there is no doubt of the constitutionality of the Act of 1945 which has been so vigorously assailed; but if there were, it should be re-

solved in favor of validity in keeping with this tenet of constitutional government.

The majority of the Court having concurred in the foregoing, the injunction *pendente lite,* heretofore issued, is dissolved and permanent injunction refused.

Petition dismissed.

Messrs. Associate Justices Fishburne and Oxner concur. Mr. Chief Justice Baker and Mr. Acting Associate Justice L. D. Lide dissent.

Mr. Acting Associate Justice L. D. Lide (dissenting):

This is a proceeding for injunction instituted by permission in our original jurisdiction. The pleadings involve the constitutionality of Act No. 131 passed by the General Assembly over the Governor's veto on April 25, 1945 (Acts 1945, page 173) providing for the refund of five cents of the six cents gasoline tax to purchasers of gasoline to be used in operating tractors or other farm equipment exclusively in farm operations. The petitioners consist of two taxpayers and certain holders in the aggregate of $621,000-00 of South Carolina bonds designated as State Highway Department Certificates of Indebtedness. They allege that the act is unconstitutional upon the grounds: That it impairs the obligation of the contract between the State and the holders of the outstanding certificates of indebtedness; that it violates Article X, Section 3, of the South Carolina Constitution, in that, in effect it diverts five cents of the gasoline tax by way of an exemption in favor of agriculture; and that, as to the petitioners and others in like situation, it constitutes a denial of the equal protection of the laws. The respondents are the South Carolina Tax Commission, to whom is committed the administration of the act, and the State Treasurer.

For the purpose of preserving the *status quo* pending the hearing and determination of the cause the Chief Justice

granted a temporary restraining order prohibiting the making of any refunds under the terms of the act. And he also ordered respondents to show cause why the relief sought in the petition should not be granted. The respondents in due time pleaded by way of return and answer, denying the material allegations of the petition and challenging the contentions of the petitioners regarding the constitutionality of the act in the respects above indicated. There was then interposed a demurrer to the return and answer, raising the legal issues as to whether the act is unconstitutional in any of the particulars alleged by the petitioners.

Eliminating the administrative provisions, the vital portions of the body of the act with which we are dealing are contained in Sections 1 and 10, which are as follows:

"SECTION 1: Any person who shall purchase and use gasoline in operating tractors or other farm equipment used exclusively in farm operations, no part of which is used in any vehicle or equipment driven or operated upon the public roads, streets or highways of this State, except when necessary to go from farm to farm, shall be entitled to a refund of all of the State tax on such gasoline except one (1¢) cent per gallon.

"SECTION 10: The tax of one cent per gallon to be retained under this Act shall be allocated five-sixths to the State Highway Department and one-sixth to the counties, the ratio now provided."

The other provisions contained in the body of the act deal in the main with administrative matters. It will thus be perceived that subject to the stated limitations and the administrative provisions of the act, the General Assembly has undertaken to provide for the refund of five cents of the six cents gasoline tax paid by farmers for gasoline in operating tractors or other farm equipment used exclusively in farm operations.

If the case as presented to the Court involved nothing more than the bare question whether it is within the power of the General Assembly to deplete the proceeds of the gasoline tax as paid into the treasury by way of a refund to a special class of users, or as the petitioners assert the proposition, to *divert* a part of the proceeds of the gasoline tax in the manner set forth in the act, we think the contention of the petitioners that the act is unconstitutional under the holdings of this Court in the cases cited below would scarcely be deemed debatable. But the respondents strongly rely upon the preamble to the act in question, which is as follows:

"WHEREAS, the tax on gasoline makes its use in a tractor and other farm equipment as defined in this Act financially impracticable; and

"WHEREAS, by eliminating all of such tax, except 1¢ per gallon, the use of gasoline in said farm equipment and tractors will be found financially practical, and more than sufficient additional gasoline will be used to offset any loss in revenue; and

"WHEREAS, the General Assembly finds that to reimburse farmers for all of said taxes paid on gasoline, except 1¢ per gallon on all gasoline used in such machinery, will not take any tax whatsoever from the total collected, but cause an increase in the total gasoline taxes to be collected, and will greatly aid agriculture in this State."

It is quite apparent that this preamble was drafted in view of the constitutional objections which might be raised, such as those interposed by the petitioners. And the theory is that the effect of the act will so largely increase the amount of gasoline consumed in the operation of farm machinery that the proceeds of five-sixths of the reserved tax of one cent per gallon will exceed the proceeds of five cents of the gasoline tax as now collected, that is to say, that the sale of gasoline for this particular purpose will be *more than six times*

the amount sold prior to the enactment of the act. Implicit in the preamble is the further proposition that with reference to the constitutional prohibition against legislation denying equal protection of the laws, it is permissible for the Legislature to classify agriculture as an occupation to which a special exemption may be legally granted.

The factual background of the recitals is challenged in the petition as "not supported by the facts"; and it is alleged that on the contrary the proposed refunds would result in a depletion of the revenue derived from the gasoline tax, and to the same extent deplete the funds available to the Highway Department for the payment of its contractual bonded obligations and for the maintenance and development of the highway system of the State in the manner required by law. The respondents on the other hand insist that the preamble represents a legislative declaration that is controlling upon this Court to the extent that the constitutionality of the act is dependent upon the correctness of the conclusions so stated; and we are asked to find in the legislative declarations contained in the preamble and implicit in the same the necessary constitutional support for the statute.

We therefore approach the problems before us with due regard for our constitutional system and the established trend of judicial procedure, pursuant to which definite limitations have been imposed by the Courts themselves upon the exercise of the power to declare a legislative act unconstitutional. As was well stated in the case of *State ex rel. Edwards v. Osborne et al.*, 195. S. C., 295, 11 S. E. (2d), 260 (which may be referred to as the second *Edwards-Osborne case*):

"In approaching the problems presented by this case, we are mindful of the constitutional principles that legislative acts may not be invalidated in cases of doubt; that the Courts and the General Assembly are coordinate branches of the State Government and except where constitutional limita-

tions have been clearly disregarded, it is not for this Court to pass on the propriety or soundness of the exercise of the legislative power.

"We recognize the soundness of the distinction between *avoiding* constitutional restrictions and *evading* them, and that where a given course of legislative action has been declared by this Court to be unconstitutional, no stigma of illegality attaches to a later statute which recognizes the condemnation of the earlier law and seeks to avoid the defects of that law.

"But we cannot dissipate constitutional provisions by forced construction, or by regarding form rather than substance. A statute is constitutional or unconstitutional by reason of its scope and purpose and effect. Whatever the language used, we test the statute by a realistic consideration of the subject which it encompasses, the purpose which it seeks to serve, and the effect it will have when put in operation.

"If constitutional limitations are directed to these factors, they must be given effect."

Having in mind the controlling principles thus accurately stated, the first question confronting us is the effect of the preamble of the act. May the Court go behind it to determine for itself whether the recitals in the preamble are really factual, supported by considerations of which the Court may take judicial notice or by matters appearing in the record, or whether such recitals are unsupported and are of a speculative or conjectural character? To answer this question in the negative would be in effect to abolish the line of demarcation between the legislative and the judicial branches of the government in regard to the determination of the validity of legislation. If the necessary facts to sustain the validity of a statute against the challenge that it violates constitutional rights can be established by legislative *fiat*,

the judicial power and duty to determine the constitutionality of an act would be practically nullified.

The act involved in the second *Edwards-Osborne case,* from which the above quotation is taken, contains a legislative declaration replete with recitals intended to show *inter alia* that the diversion of funds thereby authorized would not as a *matter of fact* impair the ability of the State Highway Department to discharge its obligations and commitments, including the proper maintenance of the State highway system; but these pointed recitals did not avail to save the constitutionality of this legislation. And in the case of *Gentry v. Taylor,* 192 S. C., 145, 5 S. E. (2d), 857, a legislative declaration was held insufficient to warrant the Court in sustaining a certain act as constitutional.

But it is nevertheless earnestly contended by the respondents that the General Assembly has found as a matter of fact that the proportionate refund of taxes paid on gasoline used in farm machinery will not reduce the total of the tax, but will even cause an increase thereof. And it is further argued that such a finding of fact is conclusive upon this Court. It is indeed true that since every reasonable presumption is indulged in favor of the constitutionality of an act, the existence of facts necessary to support it will ordinarily be presumed, and the recital of such facts by the Legislature will be presumed to be correct, provided there is a reasonable or rational basis for the same. *South Carolina State Highway Department v. Barnwell Bros.,* 303 U. S., 177, 82 L. Ed., 734.

This rule, however, does not tend to support the act under consideration, because the recitals obviously do not, and *could not, represent factual* findings. On the contrary, they express merely a hope, a conjecture, a bare speculation, that the reduction of the gasoline tax to this particular class will result in the purchase of *at least six times* the amount of gasoline heretofore sold to such buyers. Such a prognosti-

cation manifestly can have no basis in the experience of this State. And while it is stated by way of argument in behalf of respondents that 36 other States have gasoline tax refund or exemption laws, no statistics relating to the experience of any such State are given (and the terms of such statutes are not before us), save that a reference is made to the State of Mississippi, which is said to have a similar refund law applying to farm tractor gasoline, and is most closely parallel to South Carolina in certain pertinent respects. And it is further stated that during the period of four years from 1940 to 1943, inclusive, the total of such refunds in that State was $772,000.00 or an average annual refund of $193,000.00—quite a substantial amount. But there is not a single figure given to show the effect of this refund upon the revenues obtained from this particular source. There is indeed a statement in the brief that these refunds "were by no means a net loss in revenue", but this rather cryptic expression of opinion is not supported by the recital of a single fact or figure.

All of which demonstrates that we are in the field of pure conjecture. As was said by Chief Justice Hughes in the opinion delivered by him in the case of *Borden's Farm Products Co. v. Baldwin,* 293 U. S., 194, 79 L. Ed., 281, immunity to a constitutional attack upon a legislative act cannot be (quoting) "achieved by treating any *fanciful conjecture* as enough to repel attack." (Emphasis added). Indeed we know of no instance, and none has been cited to us, in which an appellate Court has held that a statute which on its face appears to be constitutionally insupportable can be upheld because of legislative declarations appearing in it, especially those looking to the unknown future, when there is no record before the Court to support such declarations, and no experience of the State involved or any other State is shown as actually justifying the same.

As might have been expected, it is said that one of the problems arising under refund acts is the proper enforcement thereof, to the end that gasoline purchased for use thereunder is not diverted to purposes not included in the refund provisions. On this point it was stated in oral argument that in North Dakota, which is largely an agricultural State, the amount of the refunds had in fact, exceeded one-half of the total collections. Merely incidentally it may be observed that while the act under consideration makes false swearing in connection therewith a misdemeanor, it is punishable by a fine but not by imprisonment, and while financial penalties are imposed for unlawful use of such gasoline it is not made a crime.

We are therefore of opinion that the recitals contained in the act cannot be deemed sufficient to validate the same as against the constitutional objections, either as relating to the impairment of the obligation of a contract or to the diversion of a substantial portion of the gasoline tax in violation of Article X, Section 3, of the State Constitution.

Proceeding now to a more specific consideration, in the light of the law, of the constitutional objections urged against the act, it is necessary to have in mind the legislative background of the problems before the Court. And this is fully set forth in the cases of *Briggs v. Greenville County*, 137 S. C., 288, 135 S. E., 153; *State ex rel. Richards v. Moorer*, 152 S. C., 455, 150 S. E., 269; *State ex rel. Edwards v. Osborne et al.*, 193 S. C., 158, 7 S. E. (2d), 526 (which may be referred to as the first *Edwards-Osborne case*); and the second *Edwards-Osborne case* hereinbefore cited.

Without entering into too much detail, it suffices to recall that the State Highway Bond Act of 1929 (Acts 1929, page 670) and the legislation imposing the present six cents gasoline tax (of which five cents goes to the State and one cent to the Counties) provided for two interrelated objec-

tives, to wit: The construction and maintenance of a State-wide system of highways to be built with accelerated speed out of the proceeds of sale of certificates of indebtedness to be issued against the revenues from five cents of the gasoline tax, and the payment of these certificates and the maintenance of the highway system, as well as the construction of additional roads, out of any remaining funds derived from such revenue. To assure that the certificates would be paid out of the gasoline revenues, notwithstanding the fact that they are general obligations of the State, for which the full faith and credit of the State are pledged, and to give effect to the "promise" of the 1929 Bond Act that the plan of construction of the highway system therein provided for would be accomplished without "costing the taxpayers of the State one cent of property taxes", the revenues derived from the five cents of the gasoline tax allocated to the State are specifically pledged to the payment of such certificates and to the general purpose of the construction and maintenance of the State Highway system as it is projected and expanded from time to time under legislative direction.

See, in addition to the cases above-cited, *City of Greenville v. Query*, 166 S. C., 281, 164 S. E., 844, affirmed in 286 U. S., 472, 76 L. Ed., 1232; *Gregg Dyeing Co. v. Query*, 166 S. C., 117, 164 S. E., 588, affirmed in 286 U. S., 472, 76 L. Ed., 1232; and *Eastern Air Transport, Inc. v. South Carolina Tax Commission*, 52 Fed. (2d), 456, affirmed in 285 U. S., 147, 76 L. Ed., 673.

The State Highway Bond Act of 1929 provided that the aggregate amount of the certificates of indebtedness that might be issued should not exceed $65,000,000.00. Under subsequent legislation the limit on the aggregate amount has varied from time to time. Pursuant to the 1945 Act (Acts 1945, page 477) the debt limit which theretofore had been fixed at $62,300,000.00 was increased by $4,000.000.00 for the purpose of acquiring the Cooper River bridge known

as the John P. Grace Memorial Bridge. See also Acts 1945, page 66.

At the time of the passage of the 1929 legislation the total mileage in the highway system was slightly less than 6,000 miles. As of June 30, 1944, the mileage had been increased by legislative appropriation to approximately 12,-000 miles. And by Act No. 167 of the Acts of 1945 (Acts 1945, page 261) approximately 5,000 miles additional were added to the highway system under a statutory direction that these roads shall be constructed and maintained in the same manner as other roads in the system.

Of the outstanding mileage of highways, about 7,000 miles have been paved to date at a cost estimated by the Highway Department to be $167,000,000.00, leaving a total of approximately 10,000 miles yet to be paved, if the statutory directions relating to the same are complied with.

The outstanding funded debt of the Highway Department as of June 30, 1944, was slightly less than $57,000,000.00. This is payable serially through the years ending 1961. With the interest that will accrue, the amount for which provision must be made out of the gasoline revenues is approximately $67,000,000.00.

On the basis of experience, under practices that have been expressly sanctioned by this Court in the *Edwards-Osborne cases* above-cited and by legislation recognizing the practices, the funded debt of the Highway Department is normally kept constant at a figure in excess of $60,000,000.00. That is to say, as the reimbursement agreements and certificates of indebtedness are reduced or retired from year to year, the Highway Department sells additional certificates up to the amount of the statutory debt limit to enable it to construct and pave the highways in accordance with the legislative program imposed upon it. '

(The statistical data above given are derived from the reports of the State Highway Department.)

It will be seen from the foregoing that when the expanded highway program is related to the legislation providing for the issuance of certificates of indebtedness and the construction of improved highways, there is not at any time *surplus* revenues available for diversion to some other purpose, without impairing to the extent of the diversion the capacity of the Highway Department to meet its statutory obligations. There is, indeed, a provision for a sinking fund, but the limitations are such that in the whole period since 1929 the amount of this sinking fund is only approximately $1,500,-000.00. If the revenues of the Highway Department exceed the estimates made in the budgets prepared by it from year to year, for the benefit of the General Assembly and as the basis for the issuance of certificates of indebtedness, these revenues are allocated in advance to the payment of the certificates and other funded debts of the Highway Department, and to the completion of the highway program. There is, in the language used by this Court in the cases cited above and in other cases, "a continuing annual appropriation" of the gasoline revenues for the purposes expressed in the applicable legislation and stated briefly above.

It is in the light of these statistics, and of the consequent heavy burden of debt resting upon the people of South Carolina in the prosecution of the important highway program, that we must view the act now in question. And the foregoing statement seems sufficient to show that the point argued by counsel for the respondents that there is a surplus which might be applied for the purposes of the refunding act is not at all tenable.

As we have already clearly indicated, the primary constitutional question before us relates to what is frequently termed the *contract clause,* contained both in our own State Constitution and the Constitution of the United States, to the effect that no law impairing the obligation of contracts shall be passed. State Constitution of 1895, Article I, Sec-

tion 8; United States Constitution, Article I, Section 10. The controlling factor here is that the revenues derived from the five cents of the gasoline tax which the act in question diverts *pro tanto* by way of refund are pledged to, and constitute the underlying security for, the payment of the outstanding certificates of indebtedness of the Highway Department, and are specifically allocated by the applicable statutes to that purpose and to the other obligations imposed by law on the Highway Department in connection with the construction and maintenance of the Statewide system of paved highways.

The fundamental legal principles are so well stated in the case of *Murray v. Charleston*, 96 U. S., 432, 24 L. Ed., 760, that we quote the same as follows:

"There is no more important provision in the Federal Constitution than the one which prohibits States from passing laws impairing the obligation of contracts, and it is one of the highest duties of this court to take care the prohibition shall neither be evaded nor frittered away. Complete effect must be given to it in all its spirit. The inviolability of contracts, and the duty of performing them, as made, are foundations of all well ordered society and to prevent the removal or disturbance of these foundations was one of the great objects for which the Constitution was framed."

But we think the question is decisively disposed of in our own case of *Martin v. Saye*, 147 S. C., 433, 145 S. E., 186. The material facts of this case are that York County sold a million dollars' worth of bonds under a statute providing that the proceeds should be turned over to the Highway Department for the construction of State highways in York County, subject to a reimbursement agreement of the Department. A subsequent statute authorized the County to use a fund of about $45,000.00, representing part of the accrued interest and premium obtained in connection with the sale of the bonds, for any purpose connected with the

hard-surfaced roads in the County. Proceedings were then instituted to obtain an adjudication that the latter act was unconstitutional because of its impairment of the obligation of the contract between the County and its bondholders.

After quoting from certain decisions of the Supreme Court of the United States, the Court said (speaking through Mr. Justice Stabler) :

"Read in the light of these principles, we are satisfied that the Act of 1928 impairs the obligation of the contract made between the county and the purchaser and holders of the bonds. It is clear that the fund derived from the premium received on the bonds and the interest paid by purchasers of the bonds is part of the security guaranteed to the bondholders by the terms of the Act; and even though the full faith, credit and taxing power of York County are pledged as security for the payment of the bonds, the taking away of any portion of the pledged security, however small, amounts to a denial and deprivation of a right accruing to the bondholders under the contract.   *   *   *

"The purchasers had a right to rely upon all the provisions of the Act, including those fixing and pledging the security for payment of the bonds, as being part of the contract of sale; and when the Legislature, by the Act of 1928, undertook to divest the holders of the bonds of a vested right accruing under the contract, it exceeded its constitutional power; and such Act is invalid because of its impairment of the obligation of the contract."

A similar holding was made in the earlier case of *State ex rel. McKinlay v. Cardozo,* 8 S. C., 71, where it appears that bonds of the State were issued to raise money for the purchase of lands to be sold to settlers thereon. The interest on the purchase money of the lands, when sold, was to be applied to the payment of the interest on the bonds issued under the act. The Legislature attempted to divert the interest money to other purposes than to payment of the in-

terest on the bonds. A bondholder brought suit to invalidate the diversion, and the Court held that the same impaired the obligation of the contract, in that, in legal effect the State had *pledged* the proceeds of the sale of the lands as security to the holders of the bonds. As the Court says:

"The security, though not in the form or language of a mortgage, attaches to it all the incidents and obligations of such an instrument, and the debtor can with no more propriety or right divert the funds from the purpose to which he has devoted it by his contract than could the mortgagor affect the priority and validity of his mortgage by converting the subject of it to some other and different use."

In that case, too, the bonds carried a pledge of the full faith and credit of the State. On this point the Court significantly said:

"The greater the certainty of payment to the holder of the bond, the higher would be the market value. If the means of meeting the interest and of reducing the bonds were provided and assured in a fixed and permanent form, there would be a higher guaranty than that promised by the pledge of 'the faith and credit of the State,' which could not be practically enforced by the process of the legislative Acts in the conscience of those who chance, from time to time, to constitute the General Assembly."

And in *Morton, Bliss & Co. v. Comptroller General,* 4 S. C., 430, 448, the Court said:

"When a sovereign State enters into a contract of borrowing with an individual it assumes to be bound, in all particulars, as an individual under like circumstances would be bound, by what is expressed or properly implied by the terms of such contract. The measure of its obligation is that applied to individuals. It is only in the consequences that flow from a breach of the contract that there is a difference between the case of a State and an individual. The individual can be sued, the State cannot."

An *unconditional* act such as that now before us, the normal effect of which would be to reduce the funds pledged by way of security would, we think, in itself impair the obligation of the contract, unless it were not only possible but demonstrable that there would be no loss of revenue. The Court would hardly be asked to sanction a legislative act reducing the gasoline tax to *all* buyers upon any theory that this might actually result in an increase of revenue, yet the principle would be the same. And if the act before the Court could be sustained it is apparent that there might be numerous classes of gasoline buyers who would seek like legislative relief by way of reduction of the tax.

The following statement of the law as contained in 12 Am. Jur., 20, seems to be quite correct under the applicable decisions:

"Since the prohibition as to the impairment of the obligation of contracts is absolute, the amount and extent of the impairment is immaterial."

And the instant case seems to come clearly within the rule laid down by the old case of *Planters' Bank v. Sharp*, 6 How., 327, 12 L. Ed., 458, and confirmed by the relatively recent case of *Minden v. Clement*, 256 U. S., 126, 65 L. Ed., 857:

"One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation—dispensing with any part of its force."

See also *W. B. Worthen Co. v. Kavanough*, 295 U. S., 56, 79 L. Ed., 1298.

Is it not obvious that the value of the contract between the State and the highway bondholders is *diminished* by this legislation? Even the *speculative* character of the act before

the Court is sufficient in itself to diminish the value of the contract, and is therefore an impairment of the same.

It is also of interest to observe that the rule usually adopted supporting legislative findings of fact and recitals concerning the same should have a narrower scope (quoting) "when legislation appears on its face to be within a specific prohibition of the Constitution". See footnote to *U. S. of America v. Carolene Products Co.,* 304 U. S., 144, 82 L. Ed., 1234. The constitutional provision relating to the impairment of the obligation of a contract in both the State and Federal Constitutions uses the *specific* and absolute terms that no law impairing the obligation of contracts shall be passed.

It is, however, rather elaborately argued by counsel for the respondents that the law as laid down in the case of *Martin v. Saye, supra,* should no longer be considered as of full force and effect, but that it has been modified by certain later decisions of the Supreme Court of the United States, and three of these cases are cited and quoted from at some length, to wit: *Richmond Mortgage & Loan Corpn. v. Wachovia Bank & Trust Co.,* 300 U. S., 124, 81 L. Ed., 552; *Gelfert v. National City Bank,* 313 U. S., 221, 85 L. Ed., 1299; and *Faitoute Iron & Steel Company v. City of Asbury Park,* 316 U. S., 502, 86 L. Ed., 1629. But we do not think the cited cases are in point here, for they do not deal with any act diminishing or reducing the security pledged for a contractual obligation. On the contrary, they relate to moratory legislation, arising out of the historic depression, the first two of them involving the foreclosure of mortgages and the valuation of the property covered thereby, and the last one involving unsecured municipal debts. And it is worthy of consideration that the first one of these cases is referred to in the case of *Federal Land Bank of Columbia v. Garrison,* 185 S. C., 255, 193 S. E., 308 (writ of certiorari denied, 302 U. S., 708, 82 L. Ed., 547), where-

in it is held that our own "moratorium" act in one particular impaired the obligation of contracts as respects mortgages existing when the act was passed. And we might add that the case of *Martin v. Saye, supra,* was cited with approval in that case as well as in other cases, and that its authority has never been impaired by any of our decisions; and we are of opinion that it continues authoritative and binding.

We are therefore unable to escape the conclusion that the present act, in taking away from the State a portion of the revenues from the five cents gasoline tax, directly and substantially impairs the contract between the State and the holders of the outstanding certificates of indebtedness, and that on this ground it must be held to be unconstitutional under the provisions of Article I, Section 8 of the Constitution of South Carolina. For the same reasons we conclude that the statute violates the corrosponding provisions of Article I, Section 10 of the Constitution of the United States.

Viewing the act as one which on its face provides for the collection of the six cents gasoline tax from farmers who use gasoline in the operation of farm machinery, and the refund of five cents of the tax to such of these farmers as comply with the administrative provisions of the act, it appears to us that it is also in conflict with Article X, Section 3, of the Constitution of South Carolina, which provides:

"No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied."

As construed in the two *Edwards-Osborne cases* hereinbefore cited and in the cases therein referred to the gasoline tax is to be considered as a continuing annual appropriation under the constitutional provision cited; and the revenues having been thus specifically appropriated to the accomplishment of the purposes of the State Highway legislation above

referred to, they are not subject to diversion in whole or in part to any other legislative purpose. We are unable to perceive any fundamental difference between an attempt to divert a part of such revenues to the payment of the general expenses of the State, as was attempted in the *Edwards-Osborne cases,* and the present attempt to divert such revenues by way of a refund to the special class of gasoline users defined in the act before us.

As applied to a case of the present character, there is indeed very little if any distinction between the principle encompassed within Article X, Section 3, of the Constitution and the provisions of the State and Federal Constitutions prohibiting the impairment of the obligation of a contract Where, as in the present situation, tax funds have not only been specifically appropriated to a stated purpose, within the contemplation of Article X, Section 3, of the Constitution, but also have been allocated and pledged to the payment of an obligation of the State, it is obviously a violation of both of the above-stated constitutional conceptions to undertake to reduce the value of the pledge by diverting a part of the funds to some other purpose than that for which it was appropriated and to the accomplishment of which it was pledged.

See *State ex rel. McKinlay v. Cardozo, supra.*

The following striking language contained in the opinion of Mr. Justice Fishburne in the first *Edwards-Osborne case* seems quite appropriate:

"We think it may not be questioned that the gasoline tax and the motor vehicle license tax constitute a special fund for the payment of State highway certificates of indebtedness, reimbursement agreements, and the other purposes specified in the law, and that this fund is not subject to process of attrition by occasional or systematic diversion that will deplete the primary source with which to pay the heavy outstanding obligations of the State Highway Department."

We do not deem it necessary to deal with the further contention of the petitioners that the act is unconstitutional on the ground that it denies to the petitioners and others the equal protection of the laws.

For the reasons above set forth, I am of opinion that the judgment of this Court should be that the Act of 1945, No. 131, enacted April 25, 1945 (Acts 1945, page 173), is unconstitutional, and therefore null and void; and hence I must dissent from the prevailing opinion herein delivered by Mr. Justice Stukes.

MR. CHIEF JUSTICE BAKER (dissenting):

I concur in the dissenting opinion of Acting Associate Justice Lide. It appears to me that he has clearly demonstrated by reason and authority the unconstitutionality of the statute involved in this case. While I doubt that I can add anything to the force of his opinion, I feel that it is incumbent upon me to make it clear that the statistical data, the reasoning and the authorities upon which the prevailing opinion relies have been carefully examined in the light of their accuracy and applicability to the facts of this case. For myself I am constrained to say that the statistical data are inaccurate; that the reasoning does not reach any of the fundamental principles stated by Acting Associate Justice Lide, and that the authorities cited afford no support for the conclusions reached.

Even if it could be determined in this case that the violation of the constitutional provision against the impairment of the obligation of contracts alleged by the petitioners involves an amount of tax funds that in itself need not be regarded as substantially affecting the credit of the State or the financial interests of the bondholding creditors and the taxpayers of the State, I do not think that the rejection of the petitioners' contentions, characterized by Mr. Justice Stukes in his opinion as "imaginary," or "shadow-boxing," or as creating a "bogey man," should pass unnoticed. The

history of all important constitutional limitations has been that except in cases involving public disasters or other emergency conditions, or directly affecting the public safety, the public health or the general well-being of the nation in matters related to the exercise of the police power, the courts have found it necessary to disregard degrees of violation, and to insist upon strict adherence to the language of the limitations, wherever life, liberty, or property rights have been involved.

Courts are fully conscious of the fact that slight infringments on constitutional safeguards are as grave as the most flagrant ones. Indeed they are more serious. Flagrant violations would defeat themselves; no court would sanction them. But slight deviations are the entering wedge which in the process of legislative and judicial growth become larger and larger as the boldness of pressure groups increases with each successive judicial victory, and in the end dissipate constitutional limitations. It would be a work of supererogation to demonstrate by illustration these elementary facts. The judicial history of the nation—especially that of our highest judicial tribunal—consistently emphasizes the doctrine that in the field we are discussing the door of encroachment must not be opened, because such an opening is itself an invitation to further and more serious encroachments.

I find here litigants—taxpayers and bondholders—who are concerned over the tremendous burden of debt imposed on the people of South Carolina, with the sanction of this Court as well as of the General Assembly, under legislation which commits the State of South Carolina to a continuously expanding highway system to be constructed and maintained out of the five cents gasoline tax, and to the maintenance of a continuous debt program now fixed at approximately sixty-five million dollars. As shown by the authorities cited by Acting Associate Justice Lide, there is a

statutory pledge (judicially sanctioned) that the gasoline revenues to the extent of five cents per gallon will be devoted to those purposes exclusively and a policy declared both by the Legislature and by this Court that the gasoline tax thus pledged shall be uniformly applied to all users of gasoline. These are legislative representations to the people of South Carolina, and to the people of other states who contemplate coming to South Carolina to live or to engage in business, that this highway program will be carried to a conclusion without resort to a property tax—"never costing the taxpayers of the State one cent of property taxes" (Acts 1929, No. 297, p. 670).

In reaching my conclusions in this case, I draw no line between the petitioners who are bondholders and those who are taxpayers. The rights of the latter are no less than those of the former, though different constitutional principles may be invoked to uphold such rights. Indeed, if Article X, Section 3, of the Constitution of South Carolina had been especially devised to place taxpayers in the same position as holders of public bonds in situations of the present character, it could not have been more effectually worded or construed by this Court for such purpose. It is a grave plight in which the taxpayer is placed if this Court announces to the General Assembly that legislative conjectures and prognostications and political expediencies shall be the determining factors in creating tax exemptions, and that either contractual stipulations with the bondholders, or constitutional protection to the taxpayers, may be ignored *with the sanction of this Court.*

I first notice what appears to me to be misconceptions as to the statistical data with which we are dealing. The *Osborne cases* from which the prevailing opinion quotes correctly reflect the provisions of the applicable 1929 legislation. Such provisions do not attempt to segregate the revenues from the five cents gasoline tax for particular purposes,

in a stated order, leaving a surplus for separate legislative disposition. The allocation of the revenues, as distinctly stated in the 1929 legislation and in the *Osborne cases,* is an allocation of "the entire amount of the revenues." *There are no surplus revenues.* The allocation is to a purpose which has already (according to the figures of the Highway Department) resulted in an expenditure of one hundred and sixty-seven million dollars for road construction alone and which presumably will entail a further expenditure of considerably more than that to meet the legislative requirements of the paving of a far greater amount of road mileage than has already been paved.

Except to the extent that the Court may take judicial notice of certain facts, such as those that appear in the reports of the Highway Department, there is no *evidence* whatsoever before the Court. But from the same source from which come the figures used by Mr. Justice Stukes to indicate that there will be in the hands of the Highway Department for road construction and maintenance, at the end of the 1946 calendar year, a total of more than thirteen million dollars, I find that no provision is made in such figures for the millions of dollars of deferred maintenance which has been built up during the war or for the hundreds of thousands of dollars that will be entailed in repairing road and bridge damage resulting from 1945 storms, or for the several million dollars that will be involved in the cost of completing road and bridge projects upon which work had already been started, or for the four million, one hundred thousand dollars which will have to be paid for the Cooper River Bridge (unless the Highway Department exercises the power to further increase the debt of the State to pay for this bridge), or even for a conservative estimate of the cost of normal maintenance during the year 1946.

Misapprehensions also seem to me to enter into the discussion in the prevailing opinion of the legal effect of the

recitals in the statute before us. Stripped of repetitious and irrelevant verbiage, these recitals amount merely to a statement on the part of the General Assembly that the elimination of the five cents gasoline tax from the sale of gasoline used in farm machinery will increase rather than diminish the revenues obtained from the gasoline tax, because such elimination will increase the use of gasoline in farm machinery to such an extent as to produce more revenue from five-sixths of one cent per gallon tax than is obtained from a five cents tax.

If the first part of the recital stood alone, it would be rejected as ridiculous on its face. When the reason for the recital is added we are entering upon a field of economic data. Is that a domain to be entered exclusively by the General Assembly or is it one in which the courts also have a place of responsibility? The question is an important one. The prevailing opinion admits that a statutory recital which is palpably erroneous could not save the constitutionality of the Act.

If we take the position in this case that the recital is not palpably erroneous, it still is true that it is asserted to be such in both the petition and the reply filed by the petitioners in this case. Does the issue of fact thus made by the pleadings create a stalemate which makes the action of the General Assembly conclusive, and excludes the litigants from invoking the aid of the court, or does this issue of fact made by the pleadings itself create the element of jurisdiction imposing upon the court the duty to determine where the truth of the matter lies? It is not a question of applying the elementary presumptions in favor of the validity of legislative action. When these presumptions have been given full effect they still are only considerations which will stay the hand of the court in declaring an act unconstitutional unless certain legal tests are met; but certainly these presumptions do not extend to the point of enabling the General Assem-

bly to invade the judicial domain, and assume to itself the power of conclusively deciding an issue of fact upon which the constitutionality of the act depends.

The petitioners in this case recognized that the recitals in the statute presented a factual controversy which may be determinative of the constitutional issues raised by them. That they were and are right in this regard is clearly shown by the briefs of counsel and by the conflicting opinions of Acting Associate Justice Lide and Justice Stukes. Hence, while contending by way of demurrer to the answer and return of the respondents that the Act is unconstitutional on its face, they at the same time moved before the Court for an order of reference so that if the Court rejected their contentions that the Act on its face is unconstitutional, the factual matter contained in the recitals, and which it appears to me is admittedly the sole foundation upon which the statute can rest, may be properly inquired into by the Court.

We, of course, are controlled in this case, at least to the extent of the contention that the statute is an unconstitutional impairment of the obligation of a contract, by the decisions of the Supreme Court of the United States. And these decisions, entirely ignored on the present point in the prevailing opinion, clearly entitle the petitioners to an opportunity to present in court, by way of a reference as sought, or in some other manner which the Court may direct, the facts upon which their constitutional contentions rest.

I do not favor the granting of the petitioners' order of reference because I am thoroughly satisfied that upon the principles stated by Acting Associate Justice Lide the statute is unconstitutional on its face, and no application for an order of reference or other proffer of testimony having been made on behalf of the respondents, there is in my opinion nothing to refer. But if a majority of the members of this Court should reach the conclusion that the statute is not invalid on its face, and that factual matters implied in

the enactment of the statute and embraced within the recitals thereof are determinative of the constitutional issue, then it is my opinion that evidence on such matters should be presented and I know of no other way in which such presentation may be made than through the granting of an order of reference.

This is no subsidiary issue in the case. It goes to the very roots of our constitutional system. In specific terms contained in appropriate pleadings, the petitioners assert as a fact that the recitals in the present Act are erroneous; respondents deny this assertion and in their pleading reiterate the facts stated in the recitals with no supporting data. There is thus a clear issue of fact which is the essence of the controversy in this case.

Whatever our own view of the situation might be, the controlling decisions of the Supreme Court of the United States make it very clear that the issue presented cannot be rejected or ignored by the Court, or the petitioners denied the opportunity to establish the correctness of the allegations of their pleadings.

In *Chastleton Corp. v. Sinclair,* 264 U. S., 543, 68 L. Ed., 841, the Court held that the validity of a rent control statute, upheld as an emergency measure at the time of enactment, may become invalid by reason of a change of conditions and that when the Act was challenged, the lower Court should have taken testimony respecting the continued existence of facts necessary to sustain the validity of the Act. As the Court there said:

"We repeat what was stated in *Block v. Hirsch,* 256 U. S., 135, 154, 65 L. Ed., 865, 870, 16 A. L. R., 165, 41 Sup. Ct. Rep., 458, as to the respect due to a declaration of this kind by the legislature so far as it relates to present facts. But, even as to them, a court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared.   *   *   *

"These cases show that the court may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law, and if the question were only whether the statute is in force today, upon the facts that we judicially know, we should be compelled to say that the law has ceased to operate. Here, however, it is material to know the condition of Washington at different dates in the past. Obviously, the facts should be accurately ascertained and carefully weighed, and this can be done more conveniently in the supreme court of the District than here. The evidence should be preserved, so that, if necessary, it can be considered by this court."

In *Weaver v. Palmer Bros. Co.,* 270 U. S., 402, 70 L. Ed., 654, the Court said:

"Legislative determinations express or implied are entitled to great weight; but it is always open to interested parties to show that the Legislature has transgressed the limits of its power. (Citing case.) Invalidity may be shown by things which will be judicially noticed (citing case), or by facts established by evidence. The burden is on the attacking party to establish the invalidating facts."

"The said legislative declaration has no greater effect and is no more binding upon the court than if the legislature had declared that a certain measure is or is not constitutional. In such contingency that question would still remain for the courts to determine." As quoted in 7 A. L. R., 521, from *McClure v. Nye,* 22 Cal. App., 248, 133 Pac., 1145.

As said by the Court in *Borden's Farm Products Co. v. Baldwin,* 293 U. S., 194, 79 L. Ed., 281:

"But where the legislative action is suitably challenged, and a rational basis for it is predicated upon the particular economic facts of a given trade or industry, which are outside the sphere of judicial notice, these facts are properly the subject of evidence and of findings. With the notable expansion of the scope of governmental regulation, and the consequent assertion of violation of constitutional rights,

it is increasingly important that when it becomes necessary for the Court to deal with the facts relating to particular commercial or industrial conditions, they should be presented concretely with appropriate determinations upon evidence, so that conclusions shall not be reached without adequate factual support.  *   *   *

"While the complaint is lacking in the specific and definite allegations as to trade conditions which would be appropriate to the plaintiff's assertions in supporting its attack on the statute, we think that the plaintiff should not be refused standing in court upon the allegations made. As we do not approve the procedure adopted below, we do not pass upon the ultimate question of the constitutionality of the statute. The plaintiff should be permitted to proceed with the cause; the motion for preliminary injunction should be heard and decided and the cause should proceed to final hearing upon pleadings and proofs; the facts should be found and conclusions of law stated as required by Equity Rule 70 1/2."

In a concurring opinion Justices Stone and Cardozo say the following:

"We are in accord with the view that it is inexpedient to determine grave constitutional questions upon a demurrer to a complaint, or upon an equivalent motion, if there is a reasonable likelihood that the production of evidence will make the answer to the questions clearer."

No authority contrary to the specific holdings made in these cases has been cited. Obviously, cases which deal exclusively with matters coming within the scope of the so-called police power are irrelevant. It is quite true that in determining whether an emergency exists so as to justify the exercise of emergency governmental powers that admittedly cannot be exercised under normal conditions, such as the need of rent control, the restriction of creditors' rights, the need of the imposition of extraordinary measures for the public health or public safety, and the like, the Courts will be slow

to question the judgment of the legislative branch of the government, but an examination of the cases dealing even with such exceptions indicates that legislative findings or conclusions to which great weight is thus given by the judicial branch are findings and conclusions based upon adequate and intelligent inquiry as the result of which the true facts or conditions underlying· the particular statute were ascertained. The cases above cited include illustrations of this phase of the matter and of course, where the legislative declaration merely sets forth a "publicly injurious and almost world-wide fact," such as a depression of extraordinary proportions, the legislative declaration may be said to be practically conclusive. *Block v. Hirsch,* 256 U. S., 135, 65 L. Ed., 865.

What is meant by a legislative injuiry on a debatable factual issue, which will influence the courts in according to the legislative declaration a presumptive element of accuracy that may not be challenged by the courts, is indicated in the case of *U. S. v. Carolene Products Co.,* 304 U. S., 144, 82 L. Ed., 1235.

That case involved the validity of the Filled Milk Act. The questions were presented on a demurrer to an indictment. The statute in question prohibited the shipment of filled milk in interstate commerce except under stated circumstances, on the ground that the product is an adulterated article of food injurious to the public health. The court said:

"In twenty years evidence has steadily accumulated of the danger to the public health from the general consumption of foods which have been stripped of elements essential to the maintenance of health. The Filled Milk Act was adopted by Congress after committee hearings, in the course of which eminent scientists and health experts testified. An extensive investigation was made of the commerce in milk compounds in which vegetable oils have been substituted for natural milk fat, and of the effect upon the public health of

the use of such compounds as a food substitute for milk. The conclusions drawn from evidence presented at the hearings were embodied in reports of the House Committee on Agriculture, H. R. No. 365, 67th Cong. 1st Sess., and the Senate Committee on Agriculture and Forestry, Sen. Rep. No. 987, 67th Cong., 4th Sess. Both committees concluded, as the statute itself declares, that the use of filled milk as a substitute for pure milk is generally injurious to health and facilitates fraud on the public. * * *

"We may assume for present purposes that no pronouncement of a legislature can forestall attack upon the constitutionality of the prohibition which it enacts by applying opprobrious epithets to the prohibited act, and that a statute would deny due process which precluded the disproof in judicial proceedings of all facts which would show or tend to show that a statute depriving the suitor of life, liberty or property had a rational basis. * * *

"The present statutory findings affect appellee no more than the reports of the Congressional committees; and since in the absence of the statutory findings they would be presumed, their incorporation in the statute is no more prejudicial than surplusage. * * *

"Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry (citing case), and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist (citing case)."

See, also the case of *City of Hammond v. Schappi Bus Line,* 275 U. S., 164, 72 L. Ed., 218, which involved the validity of an ordinance regulating the operation of buses on certain streets. Interstate commerce, police powers and alleged discrimination were some of the factors involved.

The Supreme Court refused to pass upon the issues because no facts were found, and the case was remanded to the lower court to take testimony.

What kind of an inquiry was made by the General Assembly in the present case? It did hear partisan arguments, but it took no testimony. If it had before it any authentic statistical data upon which to bottom the factual recitals in the Act, none of the counsel in the case have so contended before this Court. In a brief filed by the State Farm Bureau with our permission as *amicus curiae* statements made on behalf of the Bureau before the General Assembly in connection with the consideration of the Act by that body are quoted. But like the recitals of the Act themselves the figures given in this statement are estimates of a most conjectural and speculative character. Although it is alleged that thirty-six states have gasoline tax exemption statutes, there is not a suggestion in the record—not even in the reproduction in the brief filed on behalf of the State Farm Bureau of the statement made before the General Assembly—that in any of such states the experience has been that the enactment of the exemption statute increased the use of gasoline in the exempted classes of vehicles. Nor is it suggested in the arguments of counsel for the respondents and for the State Farm Bureau that the arguments can be founded on any such experience.

I earnestly challenge the suggestion that the Legislature can create facts by *fiat,* and the contention that although the Legislature is palpably acting without information it can instill into the judicial mind the credulity necessary to swallow a statement which is on its face incredible unless supported by evidence of facts unknown to the Court, and where such evidence has not been produced before it. To say that the State will derive more revenue from a tax of five-sixths of one cent a gallon on gasoline than from a tax of five cents per gallon is on its face a mathematical monstrosity. To say

that such an increase will nevertheless be found to arise under the terms of the present statute because of economical and statistical facts asserted by advocates who appeared before the General Assembly and by counsel who appeared in this Court, without the production of any evidence in support of their claims, adds little strength to the assertion.

If we are to resort to briefs of counsel to obtain our facts, the brief filed on behalf of the State Farm Bureau makes a strong case against the statute. There it is said that the use of gasoline is very much more efficient than lower grade and cheaper fuels; that the use of gasoline considerably reduces the quantity of lubricating oil that must be used; that there is a saving in the original cost of tractors sold in South Carolina when the proper equipment for the use of gasoline alone is installed; that the use of lower grade fuels "doubles and trebles" the amount and cost of repairs; that all tractors use gasoline for starting and warming, so that there is involved the time element of changing over to fuel oil, etc. Since according to the brief of special counsel for the respondents a tractor does the work of eight men, and according to the brief of counsel for the Farm Bureau, "to the farmer the cost of repairs is a heavy burden, but probably not as heavy a burden, as to have all his equipment standing idle in time of greatest need, because his tractor is tied up for overhaul, possibly indefinitely for lack of repair parts," there seems to be in the argument of respondents' counsel a strong showing that the greater economy and efficiency of gasoline over the cheaper fuels vastly outweighs in dollars and cents the differential represented by the five cents gasoline tax. Taking the figure of usage of eighteen gallons of gasoline per day as given by the Farm Bureau, the ninety cents of the gasoline tax paid on such gasoline surely represents less than the sum of all of the advantages and economies represented in the elements of saving above pointed out.

There is no answer to the considerations above set forth relating to the recitals of the present Act in the fact that this Court in the *Moorer case* accepted the legislative recitals in the 1929 legislation governing the State highway system.

Those recitals were based on facts of which the Court of necessity was compelled to take judicial notice. Unless the Court had stultified itself it could not have questioned the recitals in the Act of the direct relation between good roads and the agricultural, industrial and social development of the State.

In the second *Osborne case* (195 S. C., 295, 11 S. E. (2d), 260), this Court recognized the law as declared in the opinion of Acting Associate Justice Lide. In that case, as here, there was involved a statute which on its face appeared to be clearly unconstitutional under the decision of this Court in the first *Osborne case*. In an attempt to avoid the constitutional objections there pointed out, the Act involved in the second *Osborne case* was preceded by an elaborate recital expressly setting forth the determination of the State that the obligations of the Highway Department represented by its certificate of indebtedness and reimbursement agreements shall not be impaired and that the diversion of highway revenues therein provided for would come out of a surplus above the requirements for the discharge of the highway obligations, including the maintenance of the highway system in a safe and serviceable condition.

In the briefs of counsel in that case the question now under discussion was fully argued to the Court; yet when the Court came to make its decision, the recitals in the Act were deemed to have so little relevancy to the constitutionality of the purpose and effect of the Act that the Court made no mention of the matter in its opinion.

As the Court said in that case:

"In these troublous times, with public finance and economic forces taking on aspects that challenge alike the pes-

simist and the optimist in looking to the uncertain days ahead, our solemn duty can be no less than that of being diligent to maintain the balance of governmental powers that give rise to the power of a Court to declare an act of the General Assembly unconstitutional."

The strongest argument for the rejection of the view that the recitals in the present Act should be accorded the benefit of the presumptions that would exclude an inquiry by the court is found in a contrast of the opinions of Acting Associate Justice Lide and Justice Stukes. When the Justices of this Court are unable, on the record, to agree that the recitals in a statute are probably correct—when the difference of opinion is as to whether such recitals are wholly conjectural, made for the specific purpose of affecting constitutional limitations, or are probably founded on fact—it appears to me that we have a most convincing illustration of the need of inquiry as to where the truth lies. It is begging the issue to say, as does Mr. Justice Stukes, that material facts have been "found" by the Legislature. The point of the matter is that the Legislature made an obviously arbitrary declaration, rather than a finding based upon inquiry and testimony.

The attempt to distinguish the present case from the *Osborne cases* on the ground that in such cases the diversion was to purposes "foreign" to the purposes of the levy, whereas (it is argued) the present diversion is in line with the scope of the original highway legislation, answers itself. What diversion could be more foreign to the purposes of an act intended to raise revenue for a specific purpose than a subsequent act depleting such revenue by refunding a part of it to a special group of persons after it has been collected?

There is no escape from the fact that in the *Osborne cases,* as here, the principal point urged upon the Court was the fact that there was a "surplus" of revenues out of which

the diverted funds could be paid, and that therefore, there could be no unconstitutional diversion. It is true that in neither case did the Court deal with the contention that the statute impaired the obligation of contracts, but it did hold that regardless of any mathematical manipulations that might on some theory show the existence of funds available for the purposes of diversion, it was not within the power of the General Assembly to divert gasoline revenues from the purposes for which they were appropriated in the 1929 legislation.

And in the *Osborne cases* the amounts involved, when viewed in their proper aspects, were probably much smaller than those involved in the present case.

There is no way of determining just what would be the cost to the State of the refund of gasoline taxes under the present Act. But if we take even the small figures which were presented speculatively by counsel on both sides and recognize that this refund would be an annual disbursement as against the single disbursement in each of the *Osborne cases*, it is readily perceived that the amount involved in the present Act cannot in any sense be regarded as trifling.

As a matter of fact, the prevailing opinion practically adopts the argument of the respondents in the *Osborne cases,* and expressly rejects the dictum of the Court therein that the question involved is not the amount of the diversion in the particular case, but the principle of "occasional or systematic attrition" which might start with a small sum and end with a disastrously large one.

If, as the prevailing opinion appears to recognize, future legislation creating cumulative exemptions and providing for additional refunds may well result in the necessity of condemning the statutes as impairing contracts, how and when is the determination to be reached? If in each successive statute there are legislative recitals such as are found in the present case, the principles advanced in the prevail-

ing opinion would render such later legislation constitutional, because of its similarity to the present statute.

If it is answered that cumulative legislation of the present character might be unconstitutional, whereas the present statute is not, because of the amounts of money involved, how are we to deal with the matter except by an inquiry into the material facts as each case arises? If, as it appears to be recognized, such an inquiry will be ultimately necessary, it is difficult to understand how the inquiry can be avoided at this time any more than it can be avoided later.

The attempted distinction of the case of *Martin v. Saye* (147 S. C., 433, 145 S. E., 186) from this case appears to me to encompass one of the misconceptions upon which the prevailing opinion rests. It is stated that the diversion of the funds involved in that case from the statutory object to which they had been allocated, to wit, the payment of interest on certain bonds, was a "dedication * * * exclusive of all other purposes and objects" whereas it is argued that the funds involved in the present case were not allocated solely to the payment of bonds and the interest thereon, leaving a margin of funds that can be used for other purposes. That argument is a direct rejection of the *Osborne cases,* and totally disregards the expressed legislative policy that *all of the revenues* derived from the five cents gasoline tax shall be applied to the purposes set forth in the Act, none of which contemplates the diversion of any of such revenues by way of refunds or exemptions.

There is no doubt in my mind that the foundation of the prevailing opinion, as of the arguments of respondents' counsel, is the implied contention that the decisions above adverted to are contrary to judicial trend; that they do not represent the latest judicial thinking on the subject; and that to the extent that their application would invalidate the present statute, they should be regarded as overruled.

On what cases is reliance placed for this extraordinary position?

The case of *Martin v. Saye* has been repeatedly cited with approval by this Court. In the case of *Federal Land Bank v. Garrison,* 185 S. C., 255, 193 S. E., 308, as pointed out by Acting Associate Justice Lide (and where certiorari was denied by the Supreme Court of the United States), this Court quoted from *Martin v. Saye* the proposition that the unconstitutionality of an act alleged to impair the obligation of a contract "can never depend upon the extent of the change which the law effects in it. Any deviation from its terms * * * however minute and apparently immaterial in their effect upon the contract of the parties, impairs its obligation."

The case of *Martin v. Saye* was cited for the same legal proposition in *Henry w. Alexander,* 186 S. C., 17, 194 S. E., 649.

On the general subject of the diversion of public funds and on related questions of constitutional law the case has been frequently cited and followed. See, for example, *State v. Moorer,* 152 S. C., 455, 150 S. E., 269 (dissenting opinion of Judge Watts) ; *Fant v. Highway Department,* 164 S. C., 187, 162 S. E., 262; *Kirk v. Douglass, Sheriff,* 190 S. C., 495, 3 S. E. (2d), 536; *Kirk v. Clark,* 191 S. C., 205, 4 S. E. (2d), 13; *Bland v. City Council of Sumter,* 203 S. C., 392, 27 S. E. (2d), 498.

Nor have the decisions of the Supreme Court of the United States upon which this Court relied in the case of *Martin v. Saye* been overruled on any of the questions involved in the present case. It is true that in a number of cases cited in the prevailing opinion and in the arguments of counsel for the respondents the statutes were upheld notwithstanding that to some extent their effect was to impair the obligation of contracts, but in every one of these cases the court was dealing with the exercise of emergency sove-

reign powers, or with considerations of public health or general public welfare involving the exercise of the police power. I will not extend this opinion by undertaking to quote from them. It suffices to say that there isn't a suggestion in any of them that in the field of law with which we are concerned in the present case there is to be deduced the slightest variation from the principle that the question of contract impairment is not a question of degree or extent; if judicial inquiry discloses any impairment at all, the statute under attack will be stricken down lest it be made a precedent for successive impairments that would constitute the "process of attrition" of constitutional limitations that would finally render nugatory the protection which the public can find only in the precise language of the constitutional limitation.

It is still the law that "to know the obligation of a contract we look to the laws in force at its making," as held by the Supreme Court of the United States in the recent decision of *Worthen v. Kavanaugh,* 295 U. S., 56, 79 L. Ed., 1298, 1301 (decided in 1935), just as it was in the cases cited therein and in many other cases decided before and since then, starting as far back as *Sturgis v. Crowninshield,* 4 Wheat., 122, 4 L. Ed., 529 (decided in 1819), which is cited in the *Worthen case.* And the rigid application of the constitutional inhibition against the impairment of a public contract which was declared in *Dartmouth College v. Woodward,* 4 Wheat., 518, 4 L. Ed., 631 (decided in 1819), continues to be approved by our highest tribunal in the long line of cases which have been decided by it from the earliest days to the present time, as, for example, *U. S. ex rel. TVA v. Powelson,* 319 U. S., 266, 87 L. Ed., 1390, 1401 (decided May 17, 1943).

The citation in the prevailing opinion of the case of *Michaels v. Barrett,* 355 Ill., 175, 188 N. E., 921, is illustrative of the misapprehension which underlies the prevailing opin-

ion in this case. In that case the bonds which it was claimed were impaired were *county bonds.* The fuel tax law which was invoked as creating a contract with the bondholders was of course a state law. The Legislature of Illinois undertook to appropriate part of the proceeds of the gasoline tax to the payment of bonds issued for an emergency relief purpose. This appropriation was attacked as an unconstitutional diversion and an impairment of the obligation of the contract between the holders of the county bonds and the state.

But under the Illinois law the motor fuel tax is not pledged in whole or in part to the payment of county road bonds. Such bonds can be issued only when they are accompanied by specific provision for the levy and collection of a direct annual tax to pay the same. A portion of the gasoline tax revenues was allocated to the counties, but this constituted merely an additional source of revenue available to the counties for road purposes or for the payment of road bonds.

The Court pointed out that the state had assumed no responsibility for the payment of the county road bonds; that there had been no statutory or other pledge of any part of the gasoline tax to pay such bonds; and that the portions of the gasoline tax not specifically allocated by the statute imposing the tax could be utilized by the state for any lawful purpose.

The contrasting case of *Streit v. Lujan,* ——, N. M., ——, 6 Pac. (2d), 205, is a singularly pertinent authority showing the fundamental difference between a statutory situation in which the gasoline revenues may be taken to be wholly pledged, as is the case in South Carolina, or as only partially pledged to the extent of bonds issued on the strength thereof. In New Mexico there is a specific pledge of the revenues for the payment of highway obligations. In 1931 the New Mexico Legislature enacted a statute exempting from the tax on gasoline such gasoline as was purchased

for use otherwise than in motor vehicles operated on the public highways. The question in the case was whether this exemption violated the statutory pledge.

The court calls attention to another New Mexico statute expressly providing that each year the state treasurer shall set aside out of the gasoline revenues a sum sufficient to pay the principal of and interest on the state's highway obligations maturing that year, and that the gasoline tax shall not be reduced so long as the bonds remain outstanding.

As the court clearly points out, the statute is thus a specific negation of the general pledge alleged by the bondholders; the pledge consists of such amount of the gasoline revenues each year as is necessary to pay the bonds maturing that year, and this amount is required to be specially set aside and applied accordingly; that as to the remainder of the revenues there is no specific allocation.

The point of the decision therefore clearly is that when the Legislature itself has limited the pledge to the amount required each year to pay the bonds maturing and the interest accruing that year, the Legislature has not bound itself as to the application of the gasoline revenues beyond the specific amount so arrived at.

The citation in the prevailing opinion of authorities dealing with the amendment or repeal of statutes levying taxes for the purpose of discharging public bonds appears to me to be irrelevant. See, for example, the case of *Gilman v. Sheboygan*, 2 Black, 510, 17 L. Ed., 305. A general obligation bond, such as is involved in the cases in question, is payable out of any public funds available for that purpose. A statute levying a tax to pay such bonds is not a pledge of that particular tax, or a restraint upon the legislature to make other provision for the payment of the bonds. The pledge in such cases is of the total resources of the state and of the whole taxing power of the state. In contrast, the bonds issued by the Highway Department are issued under

legislation which constitutes a specific pledge of the gasoline revenues for the express purpose of avoiding the imposition of taxes under the general taxing power, though resort to this power is preserved in case of need to insure payment of the bonds.

Having regard to the legislative policy that the mileage of the road system shall be continually expanded, and that to meet the cost of construction the Highway Department shall continue to issue bonds within statutory limits that are increased from time to time, and to the resulting burden of debt resting upon the people of South Carolina, I would rather have it go out to the world of industry and to the people of this State that the solemn pledge of the General Assembly contained in the 1929 highway legislation that the "entire proceeds" of the five cents gasoline tax will be devoted to all of the obligations connected with the construction and maintenance of the highway system will be strictly adhered to, at least until the time has arrived when the system can be said to be substantially completed, and the burdens resting upon the gasoline revenues have achieved a diminishing instead of an increasing flavor. The alternative is to announce to the world a willingness on the part of this Court to see the State embark upon a program of financial inflation that utterly ignores both constitutional limitations intended to guard against that very course, and the history of economic disasters that flow from legislative and judicial rejection of the lessons of experience.